**ROYAL INDEMNITY COMPANY, a body corporate of the State of New York, Plaintiff,**

v.

**AETNA INSURANCE COMPANY, a body corporate of the State of Connecticut, Defendant.**

**Civ. A. No. 13970.**

United States District Court
D. Maryland.

July 15, 1964.

Richard H. James, Paul M. Higinbothom, Baltimore, Md., for plaintiff.

M. King Hill, Jr., and Smith, Somerville & Case, Baltimore, Md., for defendant.

WINTER, District Judge:

Which of McIntyre Chevrolet, Inc. (Dealer) or The Second National Bank of Cumberland (Bank) was the owner of a 1957 Buick automobile on April 21, 1961, at the time that it was in the possession of Donald Welker, a prospective purchaser of the vehicle, and involved in a head-on collision on Route 28 about two miles south of Ridgely, West Virginia, is the principal question to be decided. The question arises because plaintiff insured Dealer against claims for personal injuries and property damage arising out of the operation of any automobile owned by Dealer and used with its permission, and of non-owned automobiles while being used in connection with Dealer's business of operating an automobile sales agency. Defendant insured Bank against claims for personal injuries and property damage arising out of the operation of any automobile owned by Bank and used with its permission and, by special endorsement, specifically, with respect to any such automobile, " * * * while being repossessed by the named insured, or the maintenance or use thereof in connection with resale following such repossession * * *."[1]

The 1957 Buick was originally purchased from Dealer by David N. Cook, of Hyndman, Pennsylvania. The vehicle was purchased under a conditional contract of sale, and this contract was assigned to Bank. Cook became delinquent in his payments and agreed to a voluntary repossession of the vehicle by Bank. On March 23, 1961, an employee of Bank took possession of the vehicle, together with the Pennsylvania motor vehicle title, executed in blank by Cook. The vehicle was delivered to Dealer's garage and sales lot in Cumberland, Maryland, and the title papers were retained by Bank.

Dealer retained the vehicle on its lot for the usual period of retention, i. e., fifteen days, in order to give the delinquent purchaser an opportunity to redeem the vehicle, as required by the Annotated Code of Maryland, Article 83, § 142. When the fifteen days had expired, Dealer, without any prior consultation or approval from Bank, reconditioned and cleaned the automobile, at an expense of $120.00 to $300.00 to itself, and placed the car on its used car lot, with other vehicles owned by it, for resale. Mr. Welker, a prospective purchaser, appeared on April 21, 1961 and requested permission to drive the car to his home in West Virginia to show it to his wife. Dealer's salesman granted such permission, without prior consultation with Bank, and, while Welker was acting within the scope of the permission granted him, the accident occurred. As a result of the head-on collision, one of the occupants of the other car was killed and

1. The policy also afforded protection with regard to certain "non-owned" automobiles, but only under conditions, none of which is claimed to have been met here.

others were seriously injured. Plaintiff undertook the investigation of the accident and claims asserted as a result of it, and ultimately made settlement in the aggregate amount of $42,500.00. When defendant refused to contribute to the settlement, plaintiff sued, seeking a declaratory judgment and recovery of all or a part of the aggregate sum which it disbursed, with interest and costs.

Dealer and Bank were not strangers to one another. Agreements for the financing of the purchase of new and used vehicles existed between them for a number of years. Plaintiff's claim to recovery rests upon the provisions of the latest "Dealer Retail Agreement," dated January 6, 1960, in effect between them at the time of the accident. The Dealer Retail Agreement was a document wherein Dealer agreed to sell Bank "paper" covering new and used and commercial vehicles under "without recourse" assignments. The agreement also provided for Dealer's repurchase of cars repossessed by Bank. The language pertinent here follows:

"2. We [Dealer] shall have no responsibility to purchase repossessed cars from you unless tendered to us within the ninety (90) day period herein referred to. If any car (including converted or confiscated cars) is repossessed for any reason, we will purchase it, as is, from you for cash when tendered at our place of business within ninety (90) days after maturity of the earliest installment unpaid and will pay you therefor the entire unpaid balance owing on the car. *Until we pay you therefor you may store such repossessed cars at our place of business and we will hold them as a bailee for you free of charge as your property and will deliver them to you at your request.*

"3. If we are in default to you at the time of repossession, cars may be tendered by registered mail notice sent to our last known address; if we are not in business at that time tender of repossessed cars is waived.

*If we fail to purchase repossessed cars or are out of business we shall be responsible for any deficiency incurred by you in the sale of repossessions at public or private sale, held with or without notice.*

"4. You will allow us the cost, as agreed in writing, of repairing actual direct collision damage necessitating repossession; the allowance is not to exceed the unpaid balance on the car after deducting both the 'as is' value and the amount of any deferred certificates or other holdback relating to the car.

"5. It is agreed that if, in reselling repossessed cars which we purchase from you, covered by paper sold to you in any twelve-successive-month period beginning with the date of this agreement (excluding paper bearing our full endorsement or guaranty), we incur a loss in excess of 5% of the volume of our paper sold to you in such period, you shall reimburse us for such excess, provided we have resold the cars for their reasonable value within ninety (90) days after delivery to us. Such loss shall be determined by the difference between the amount we realize from the sale of such repossessed cars and the amount we pay you for same. We shall credit total profits on resales against total net losses. This paragraph applies only (1) if we have sold you paper covering at least 100 cars during such period, (2) if we perform all of our obligations to you, and (3) if, before incurring such excess losses, we give you written notice of the offered price of each car and the opportunity to resell it." (emphasis supplied)

Evidence was produced to show the actual course of dealings between the parties, not only with respect to the vehicle involved in the accident, but also in regard to the procedure followed for a large volume of repossessed cars over a considerable number of years. The testimony in all essential respects was undisputed.

It appears that upon repossession by Bank, a repossessed vehicle was always delivered to Dealer, kept by Dealer for the statutory period of redemption, and then reconditioned and placed on Dealer's used car lot for resale with its usual stock of used automobiles. According to testimony by an officer of Bank, Bank was satisfied for payment to be made when the vehicle was sold to another purchaser. According to testimony by the general manager and president of Dealer, Bank expected payment within thirty days after delivery of a repossessed vehicle to Dealer, but generally Bank was willing to carry the matter until such time as the vehicle was sold to another purchaser. When payment was made, Bank would deliver the title papers to Dealer so that a new title could be issued to a new purchaser. Once a repossessed vehicle was delivered to Dealer, Bank never exercised any dominion or control over it. Dealer decided what repair or reconditioning of the vehicle was required, the person or persons to whom the vehicle should be sold, the extent to which prospective purchasers should use a vehicle for purposes of demonstration, and the selling price, all without prior consultation or approval from Bank. As was true with respect to the vehicle involved in the accident, Dealer provided dealer license plates for the operation of a vehicle until such time as there was a transfer of title to a new purchaser. Dealer never required any formal written tender, as impliedly required by ¶ 2 of the Dealer Retail Agreement, but was satisfied simply to accept delivery of repossessed vehicles made to it by employees of Bank.

As before stated, the essential question is that of ownership of the 1957 Buick on the date of the accident, because defendant's insuring agreements, so far as pertinent to this case, are all conditioned upon Bank's ownership of the vehicle, the operation of which gave rise to a claim for damages against Bank. Although ¶ 2 of the Dealer Retail Agreement provides: "Until we pay you * * * you may store such repossessed cars at our place of business and we will hold them as a bailee for you free of charge as your property * * *," and ¶ 3 employs the phrase "if we fail to purchase repossessed cars * * *," the latter implying that a purchase does not occur until payment is made, the formal contract and the course of dealings between the parties leads to the conclusion that title to the repossessed vehicle in question passed from Bank to Dealer at the time that Bank delivered the repossessed car to Dealer for resale.

■ The relationship between Bank and Dealer, under the facts stated and the Dealer Retail Agreement, was one of conditional vendor and conditional vendee, because Dealer unconditionally bound itself to accept and to pay for the vehicle, and, in fact, with respect to this vehicle, as well as all of the repossessed vehicles which were the subject of dealings between the parties over the course of years, accepted the vehicle and unconditionally agreed to pay. By the terms of the Agreement payment was due upon Bank's delivery of vehicle to Dealer; in practice, Bank extended credit usually for thirty days or the date of resale of the vehicle.[2]

■ The literal language of the Dealer Retail Agreement relied on by plaintiff to sustain its recovery would seem to establish a bailor-bailee relationship, coupled with authority in the bailee [Dealer] to sell the vehicle—in short, a consignment from Bank to Dealer. While every case of this type depends on its own facts, the discussion in 2 Williston, Sales (1948 Ed.) § 338, makes clear that the presence of an unconditional promise to purchase and pay makes the transaction a sale and not a consignment, so that it follows that the language relied on by plaintiff creates a security interest

2. In fact, payment by Dealer to Bank for the 1957 Buick has not been made but this is because the accident occurred, questions have arisen concerning collision insurance coverage and it was mutually agreed that payment be withheld.

in Bank but falls short of retaining ownership in Bank. In this text the distinction between conditional sales and consignments is discussed, and it is there pointed out that the essence of a bailment is an agreement on the part of the person to whom specific goods are entrusted to return the specific goods at some future date, but, nevertheless, a bailment may still exist where the bailee has the right to sell, even where he may retain a part of the proceeds and even where he is permitted to substitute his credit for the proceeds of sale rather than being required to account for the specific proceeds. But it is then added (pp. 307–308):

> "It is possible, however, for the form of a consignment to be used in order to cover a bargain which is essentially a conditional sale, using that term in the narrow sense of an agreement in which one who agrees to buy is given possession and use of the property immediately, but not the title, until the price is paid. *The difference between such a sale and a consignment, even if the consignee is allowed to make himself a debtor for the price, is that in the conditional sale, but not in a bailment, the person to whom the goods are delivered enters into an absolute obligation to buy them and pay the price, and, therefore, acquires an immediate property in them subject to the seller's security title.* Difficult questions of fact have arisen in some cases to determine whether the particular transaction fell within one class or the other." (emphasis supplied and footnotes omitted)

Not only did Dealer unconditionally promise to buy and to pay, the evidence establishes that factually the parties permitted Dealer to treat the car as its own from the time of delivery to it by Bank until delivery to a new purchaser, subject only to paying Bank the unpaid balance owing on the car as a result of the previous financing agreement by the previous purchaser. In regard to repairs or reconditioning which were required, Dealer made the decision of what to do and how much to spend. By ¶ 4 of the Dealer Retail Agreement only such repairs as resulted from actual direct collision damage were chargeable to Bank, but, in any event, Bank's authorization for such repairs was never solicited. Dealer decided the selling price on a resale of the repossessed vehicle, with any profit realized as a result of the resale accruing to Dealer. If the resale resulted in a loss, a part of the loss was chargeable to Bank, in accordance with the formula expressed in ¶ 5 of the Dealer Retail Agreement.

■ The retention by Bank of title papers does not destroy the sale aspect of the transaction, because all of the requirements of the Maryland law, in effect at the time of the transaction, i. e., Annotated Code of Maryland, Article 83, §§ 36 and 37, to pass the "property in the goods" were met, cf. Inland Mutual Insurance Company v. Stallings, 263 F.2d 852, 854–855 (4 Cir. 1959); Olin Mathieson Chem. Corp. v. Southwest Casualty Co., 149 F.Supp. 600 (D.C.W.D.Ark. 1957).[3] Not without significance also was the use by Dealer of dealer registration plates, because Annotated Code of Maryland, Article 66½, § 62(b), limits the use of dealer registration plates on vehicles lent to prospective purchasers for the purpose of demonstration to vehicles "owned by them [dealers]."

Commercial Credit Corporation v. Stan Cross Buick, Inc., 343 Mass. 622, 180 N.E.2d 88 (1962), cited by plaintiff, is an example of *where a repurchase agreement for repossessed vehicles was held not to vest title in the dealer-repurchas-*

---

3. It is true that the Maryland statute constitutes the actions of the parties sufficient to pass "property" in the 1957 Buick from Bank to Dealer unless "a different intention appears" (Art. 83, § 37). A contrary intention stemming from the language of the Dealer Retail Agreement purportedly constituting Bank a bailor cannot survive the actions of the parties, described in the text, which permitted untrammeled dominion in Dealer, Art. 83, § 36(2).

er.[4] Motor Credit Corporation v. Woolverton, 99 So.2d 286, 72 A.L.R.2d 334 (Fla.1957), also cited by plaintiff, is an example of where a dealer, as agent of a repossessing lender, was held to have passed good title to a third party purchaser against the claim of the repossessing lender. These cases, however, only demonstrate that each transaction stands on its own facts, including the context in which the question arose, and that as stated in the quotation from Williston, supra, difficult questions of fact are presented in some cases where it has become necessary to characterize a particular transaction. Examples of contrary holdings, as between a dealer and an ultimate purchaser, are two recent decisions in this circuit, Wicker v. National Surety Corporation, 330 F.2d 1009 (4 Cir. 1964), and Lynch v. United States Branch Gen. Acc. Fire & Life Assur. Corp., 327 F.2d 328 (4 Cir. 1964), where the ultimate purchaser was determined to be the owner, for insurance purposes, notwithstanding, in the Lynch case, that the dealer retained title for the purpose of security.

United States Fidelity and Guaranty Company v. Trussell, 208 F.Supp. 154 (D.C.W.D.Va.1962), heavily relied on by the plaintiff, is inapposite here. First, the case is of doubtful authority since the decision in the Wicker case, supra. More importantly, its result rests upon an application of the requirement of Virginia law that legal ownership of a motor vehicle does not pass until a new registration in the name of the transferee is effected, even though, as the Court found, title passed by operation of law to the lender, who had delivered a repossessed vehicle to a dealer for resale. Maryland law—that applicable here—does not render registration so all important as the indicia of legal ownership. Rather, Annotated Code of Maryland, Article 66½, § 47, neither requires a registered dealer who holds a vehicle for resale to obtain registration in his own name as an indicia of his ownership, nor does it require a registered dealer to re-register a vehicle in the name of the purchaser as a condition precedent to a transfer of the dealer's title or interest to the purchaser. See, Inland Mutual Insurance Company v. Stallings, supra, as recognizing the latter effect of the Maryland statute. Indeed, Annotated Code of Maryland, Article 66½, § 24, requires that one must be an owner to be eligible to apply for a certificate of title. See also, Hofslund v. Metropolitan Casualty Ins. Co. of N. Y., 188 F.2d 188 (7 Cir. 1951).

I conclude that Dealer was a conditional vendee and was the owner of the 1957 Buick. Bank was a conditional vendor and had parted with ownership of the vehicle. It necessarily follows that defendant's insurance was inapplicable, and that Welker operated the vehicle at the time of the accident only with the permission of Dealer and not that of Bank, Olin Mathieson Chem. Corp. v. Southwest Casualty Co., supra, Annotation 36 A.L.R.2d 673, 675, et seq. (1954).

Counsel may prepare an appropriate judgment.

4. Commercial Credit Corp. v. Stan Cross Buick, Inc., supra, may be considered to be directly contrary to the ultimate holding here, except that the course of dealings between the parties over a period of years was not shown. Thus, the language constituting the dealer a bailee until payment was made may have been considered to express a contrary intention to pass "the property in the goods" within the meaning of § 19 of the Uniform Sales Act in effect in Massachusetts.