639 F.2d 1213
 30 UCC Rep.Serv. 1566
 In re SITKIN SMELTING AND REFINING, INC.
EASTMAN KODAK COMPANY, Plaintiff-Appellant,
v.
G. M. HARRISON, Trustee and C. I. T. Corporation,
Defendants-Appellees.
 No. 79-3040.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 March 16, 1981.
 Perloff, Reid & Gibbons, Mayer W. Perloff, Mobile, Ala., James L. Baillie, Minneapolis, Minn., for plaintiff-appellant.
 Johnston, Barton, Proctor, Swedlaw & Naff, Sydney L. Lavender, Gilbert E. Johnston, Jr., Birmingham, Ala., Otterbourg, Steindler, Houston & Rosen, Jonathan N. Helfat, New York City, G. M. Harrison, Sr., Dothan, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before SIMPSON, RONEY and THOMAS A. CLARK, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 This case raises a single issue: whether the Bankruptcy Court erred in determining that possession of film entrusted to a now bankrupt metal refiner should be given to a secured creditor of the refiner rather than to the film manufacturer that entrusted it to the refiner. Holding that the bankrupt did not gain sufficient rights under the contract with the manufacturer to give its creditor a security interest in the film, we reverse.
 
 
 2
 The background of the transaction between plaintiff and the bankrupt company, as well as the terms of the contract, are somewhat unique. Prior to its bankruptcy, Sitkin Smelting and Refining Company was in the business of processing industrial waste for the recovery of precious and base metals. On January 19, 1978, Sitkin entered into an agreement with plaintiff, Eastman Kodak Company, in which it agreed to process a minimum of 500,000 pounds of print film waste and purchase the silver content recovered upon processing. This film waste consisted of film manufactured by Kodak which had been rejected as inferior by its quality control department. Its silver content is recovered by a controlled burning process which leaves an ash containing the metal.
 
 
 3
 The contract provided that it would run on a trial basis for at least two months. The waste would be picked up by Sitkin at Kodak Park in Rochester, New York, in lots of 36,000 pounds each. Responsibility for the waste transferred to Sitkin upon leaving Kodak Park.
 
 
 4
 Kodak would not sell outright the unprocessed film waste for two reasons: first, since the film was inferior, Kodak was concerned that it not find its way into the possession of persons who would use it as film; and second, collateral litigation made it important that the film not fall into the hands of Polaroid, for whom Sitkin had also been disposing of film waste. Therefore, under the contract, Kodak's ownership of the film waste would cease only upon its "destruction or change of identity." Either party had the right to cancel the contract with two days' notice. Upon cancellation, the film waste in Sitkin's possession would, at Kodak's option, be returned to Kodak or processed. In no event could Sitkin do anything with the film but destroy it.
 
 
 5
 The contract called for a "settlement," which was a determination of the amount owed by Sitkin after it processed each lot. A settlement would be calculated by multiplying the troy ounces of silver recovered in a lot by a percentage of a published price quote for silver. A settlement would take place thirty days after receipt of each lot, with payment due sixty days after receipt.
 
 
 6
 On March 13, 1978, within the two-month period of the contract, Sitkin filed for protection under Chapter 11 of the Bankruptcy Act, and was adjudicated bankrupt shortly thereafter. At that time, Sitkin had in its possession over 382,000 pounds of Kodak film waste.
 
 
 7
 On August 30, 1978, Kodak filed suit to reclaim the unprocessed film waste, which is stored in the original Kodak cartons in two Alabama warehouses. The defendants are the Trustee in Bankruptcy and the C.I.T. Corporation, a secured creditor of Sitkin. Although an additional quantity of film had already been processed and Kodak has not been paid for the recovered silver, it does not seek payment for the silver in this action.
 
 
 8
 In this contest between Kodak, a purported bailor, and C.I.T., who claims a security interest, Alabama law controls. See, e. g., Fowler v. Pennsylvania Tire Co., 326 F.2d 526, 530-31 (5th Cir. 1964); Universal Medical Services, Inc. v. Kutcher, 460 F.2d 524, 526 (3d Cir. 1972).
 
 
 9
 Kodak's claim is based on the general rule that a bailor may reclaim property it entrusts to a bailee who subsequently files for bankruptcy. See, e. g., Sandack v. Tamme, 182 F.2d 759 (10th Cir. 1950). See generally 4A Collier on Bankruptcy P 70.18(4) (1978). C.I.T., as a secured creditor, claims all property in the possession of Sitkin to which its security interest "attaches." Under Alabama law, a security interest attaches to property in which the bankrupt has "rights," provided that the property falls within the security agreement and the secured creditor has given value. Ala.Code tit. 7, § 9-204 (1975). C.I.T. contends that its security interest attaches to the film waste and that Kodak has only an unperfected security interest in the property.
 
 
 10
 In resolving the conflicting claims, the Bankruptcy Court found that the agreement between Kodak and Sitkin contemplated both a bailment and a sale: Sitkin held the unprocessed waste as bailee for Kodak; a sale arose only after Sitkin processed the waste and became obligated to purchase the recovered silver content. The court went on to hold, however, that Sitkin's possession of the unprocessed waste, even though only a bailment, was a sufficient "right" in the waste under Alabama law so that C.I.T.'s security interest attached and was superior to Kodak's interest. Ala.Code tit. 7, § 2-403 (1975). In so holding, the court relied on this Court's decision in In re Samuels & Co., 526 F.2d 1238 (5th Cir. 1976) (en banc ).
 
 
 11
 Section 2-403, identical to its counterpart in the Uniform Commercial Code, permits transferors of property to pass greater title in certain circumstances than they can themselves claim.[1] Section 2-403(1) provides that a buyer of goods who holds only voidable title has the power to transfer good title to a "good faith purchaser." The purpose of this rule is to "promote the greatest range of freedom possible to commercial vendors and purchasers." In re Samuels & Co., 526 F.2d at 1242.
 
 
 12
 In Samuels, this Court held that a secured creditor may be a "good faith purchaser" within the meaning of section 2-403(1), and may thus take good title to property to which its security interest attaches. Concluding that a creditor's security interest in inventory attached to goods in the possession of a bankrupt, we denied the petition to reclaim by the unpaid sellers of those goods.
 
 
 13
 Samuels, however, involved a bankrupt who was a purchaser from the claimant. In the present case, the Bankruptcy Court erroneously extended Samuels to bailments. The section involved in Samuels was 2-403(1), which applies where the bankrupt was a purchaser of the goods in question. With a security interest that gave it the position of a "good faith purchaser" from a bankrupt who was itself a purchaser, C.I.T. would take title as against a seller to the bankrupt.
 
 
 14
 Section 2-403(2), however, is the provision which applies where the bankrupt holds the goods as a bailee, instead of as a purchaser. That section provides that a merchant who is entrusted with goods has power to transfer good title only to a "buyer in ordinary course of business." Although C.I.T. may be a good faith purchaser, it is specifically excluded from being a buyer in ordinary course of business under Alabama law. Ala.Code tit. 7, § 1-201(9) (1975). Section 1-201(9), which defines a buyer in ordinary course, states that "buying" does not encompass a transfer "as security for ... a money debt."[2] This language has been consistently interpreted to exclude holders of security interests from the coverage of section 2-403(2). See, e. g., In re Medomak Canning Co., 25 U.C.C.Rep.Serv. 437 (D.Me. April 21, 1978; aff'd 1st Cir. November 21, 1978); Cosgriff v. Liberty National Bank & Trust Co., 58 Misc.2d 884, 296 N.Y.S.2d 517 (1968). See generally Annot., 87 A.L.R.3d 11, 34-36 (1978).
 
 
 15
 The less inclusive "buyer in ordinary course" term was used for bailments because the "older loose concept of good faith and wide definition of value combined to create apparent good faith purchasers in many situations in which the result outraged common sense." Official Comment to § 2-403, Ala.Code tit. 7, § 2-403 (1975). By restricting the category of protected buyers, section 2-403(2) serves to provide greater protection for a bailor of goods than for a seller. See R. Duesenberg & L. King, 3A Sales and Bulk Transfers under the U.C.C. § 10.06(2) (1980). These commentators state:
 
 
 16
 It should be noted that the test of Subsection (2) is not that of good-faith purchase, but a purchase in the ordinary course. This is an important distinction.... (T)he categories of sheltered parties under Subsection (1) of Section 2-403 is considerably more expansive than under the entrustment subsections, for "buyer in the ordinary course of business," while it does include a secured or unsecured transaction, does not include a taking "as security for or in total or partial satisfaction of a money debt." Comparing the two criteria, it follows, for example, that an owner defrauded by a buyer giving a bad check would lose against a creditor of the buyer who took a security interest in the goods; but would not lose against such a creditor if in place of a fraudulent purchase, the owner had entrusted the goods to a merchant who without authority pledged them as security for a debt.
 
 
 17
 Id. (footnotes omitted).
 
 
 18
 In light of its finding of a bailment of the unprocessed film waste, the Bankruptcy Court erred in applying section 2-403(1) rather than 2-403(2). Because C.I.T. is not a buyer in ordinary course within the meaning of the latter provision, it cannot divest Kodak of title in the film waste.
 
 
 19
 C.I.T. disputes on appeal the Bankruptcy Court's finding that Sitkin's possession of the unprocessed film waste was a bailment. It contends that the agreement between Kodak and Sitkin was under Alabama law a contract for sale of goods at a future time. While the question is a close one, we conclude that the Bankruptcy Court did not err in finding a bailment.
 
 
 20
 NYTCO Services, Inc. v. Wilson, 351 So.2d 875 (Ala.1977), is the controlling Alabama case. There, the Supreme Court of Alabama in finding a bailment rather than a sale between farmers and a grain company, cited two principal factors: the option of the farmers to require the return of their grain or to direct its sale, and evidence indicating the grain was being stored on the farmers' behalf. 351 So.2d at 879.
 
 
 21
 Both factors are present here. First, Kodak clearly retained the option under the contract to have the film waste returned or processed. Processing, of course, would result in the sale of the silver content to Sitkin. That Sitkin also had the right to bring about a sale by processing the waste makes no difference. A bailment may still exist where the bailee has a continuing option to purchase or to sell. See, e. g., Royal Indemnity Co. v. Aetna Insurance Co., 231 F.Supp. 657, 661 (D.Md.), aff'd, 338 F.2d 700 (4th Cir. 1964); In re H.M. Hodges & Co., 38 F.Supp. 597, 597 (D.Conn.1941).
 
 
 22
 Second, as the Bankruptcy Court noted, several aspects of the arrangement indicated a bailment. Responsibility for the waste transferred to Sitkin upon leaving Kodak Park, which is consistent with a bailee's duty of care. The film was clearly imprinted with Kodak's name, tagged identifying it as Kodak property, stored in the original Kodak cartons, and kept in separate warehouses apart from similar material to be processed. Finally, in their bookkeeping, Kodak did not show the waste as a receivable; Sitkin did not carry it as inventory.
 
 
 23
 The First Circuit case of In re Medomak Canning Co., 25 U.C.C.Rep.Serv. 437, is an analogous case finding a bailment. In that case a large food retailer agreed to supply Medomak with certain ingredients for processing, and to then purchase the finished product. When Medomak filed for bankruptcy, the retailer sought possession of the ingredients. As here, the case turned upon whether the transaction between the two companies was a bailment or a sale.
 
 
 24
 In finding that Medomak held the ingredients as a bailment, the Bankruptcy Court looked into the intentions and circumstances of the parties rather than to a provision in the contract designating the transaction a "purchase" by Medomak. In particular, the court found that no purchase price was agreed upon as to the ingredients prior to processing. A price was instead fixed only for the finished product. In addition, the court held that the parties did not intend for the retailer to part with any interest in the ingredients furnished to Medomak until they were processed.
 
 
 25
 As in Medomak, the agreement between Kodak and Sitkin did not set a purchase price for the film waste prior to its processing. Although the contract estimated the silver content of the waste, the exact amount of silver as well as the purchase price became certain only after the waste had been processed. Moreover, as the Bankruptcy Court held, Kodak and Sitkin clearly showed an intention to avoid any rights in Sitkin until the destruction of the film waste.
 
 
 26
 C.I.T.'s final argument, rejected by the Bankruptcy Court, is that the waste was delivered to Sitkin on a "sale or return" basis. Ala.Code tit. 7, § 2-326 (1975). Under section 2-326, goods in the possession of a buyer which were delivered on a sale or return basis are subject to the claims of the buyer's creditors.[3]
 
 
 27
 The type of sale or return contemplated in section 2-326 is a consignment, where a buyer "purchases" goods with the understanding that the seller will accept their return in lieu of payment if they fail to be resold. The Official Comment to section 2-326 states that this type of transaction is "so strongly delineated in practice and in general understanding that every presumption runs against a delivery to a consumer being a 'sale or return.' " Official Comment to § 2-326, Ala.Code tit. 7, § 2-326 (1975).
 
 
 28
 The transaction between Kodak and Sitkin is not a sale or return within the meaning of section 2-326, since the goods were not delivered for resale with an option to return. C.I.T., then, fails to overcome the presumption against the application of section 2-326.
 
 
 29
 The Bankruptcy Court properly concluded that the agreement between Kodak and Sitkin provided for a bailment of the unprocessed waste. Since under Alabama law the bailed goods are not subject to C.I.T.'s security interest in the inventory of the bankrupt, Kodak is entitled to reclaim possession.
 
 
 30
 REVERSED.
 
 THOMAS A. CLARK, Circuit Judge, dissenting:
 
 31
 I respectfully dissent. This court has recognized that "(i)n distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or in some altered form; if another thing of equal value is to be returned, the transaction is a sale." Guidry v. Continental Oil Co., 350 F.2d 342, 345 n. 10 (5th Cir. 1965). Consideration of the contract at issue and the authority relied on by the majority leads me to the conclusion that this transaction was a contract to sell goods at a future time and not a bailment. Since this type of agreement amounts to a "contract for sale" under § 2-106(1) of the Uniform Commercial Code, Ala.Code § 7-2-106(1), this court's holding in In re Samuels & Co., 526 F.2d 1238 (5th Cir. 1976) (en banc), gives the C.I.T. Corporation sufficient right in the film waste under Alabama law so that its security interest attached and was superior to Eastman Kodak's unperfected interest in the goods. Therefore, I would affirm the district court's judgment for the C.I.T. Corporation on the ground that the transaction at issue here was a sale, and accordingly Samuels controls our disposition of this appeal.
 
 
 32
 With one important exception, I agree with the majority's statement of facts in this case. The majority states that in the contract between Eastman Kodak (hereinafter referred to as "Kodak") and Sitkin, the latter "agreed to process a minimum of 500,000 pounds of print film waste and purchase the silver content recovered upon processing." Ante, at 1214 (emphasis added). I disagree. While the silver content in the film waste was without question the sole reason these companies entered into this agreement, I think the majority has incorrectly identified the goods being sold. The goods to be sold by Kodak to Sitkin were the 500,000 pounds of film waste which contained recoverable silver. There was no sale or purchase of just the silver content in the film waste. The silver content in the film waste, which could only be salvaged upon processing, was to serve only as a pricing mechanism for the sale of the 500,000 pounds of film waste. This is readily apparent from the contract itself which, because of its importance to an understanding of this case, I set forth in its entirety:
 
 
 33
 No. MP 6147
 SITKIN SMELTING & REFINING, INC.
 Brass, Bronze & Aluminum Ingots
 Gold, Silver & Nobel Metals
 P.O. Box 708 - R.D. #3
 Lewistown, Pa. 17044
 Phone: (717) 543-5631
EASTMAN KODAK COMPANY
KODAK PARK DIVISION Page 1 of 2
BUILDING 211
ROCHESTER, NY 14650
Attn: Mr. Dennis Zink Date January 19,1978
 Sales Supervisor ---------------
 Surplus Materials
Sitkin Smelting & Refining, Inc. Agrees To Purchase From The Above
-------------------------------------------------------------------------------
QUANTITY MATERIAL
-------------------------------------------------------------------------------
PERIOD: Two-month minimum trial contract.
MATERIAL: Loose PR-10 print film waste containing approximately 173 T.O.
 of silver per net ton of film waste.
VOLUME: Minimum 500,000 pounds.
LOT SIZE: Trailerload - minimum 36,000 pounds net weight.
SETTLEMENT: To be effected 30 days after receipt for each lot
 (trailerload). The net dollar value for each lot payable to
 Kodak will be calculated by using 50% of the calculated
 average Handy & Harman quote for silver during the 30-day
 settlement period, multiplied by the agreed upon troy ounces
 of silver content per lot. The values quoted are minimal
 values only. If higher values are realized during the
 two-month trial contract period, those values will be
 automatically passed on to Kodak.
PAYMENT: 60 days after receipt.
F.O.B. Our trailers at Ship on or before:
 Kodak Park, Rochester, NY
Terms See page 2.
Remarks
 (1) HYDRAULICALLY BRICKED OR (2) ANY MATERIAL (3) VARIATION OF
 BRIQUETTED MATERIAL NOT OVER 15 INCHES IN PLUS OR MINUS 5%
 ACCEPTABLE. MORE THAN TWO FROM THE
 DIMENSIONS WILL BE AGREED-UPON AMOUNT
 SUBJECT TO A IS ALLOWABLE.
 PREPARATION CHARGE.
-------------------------------------------------------------------------------
 KINDLY SIGN THE ORIGINAL COPY AND RETURN IT TO US FOR OUR FILES, RETAINING
 THE OTHER COPY FOR YOUR FILES.
 Sitkin Smelting & Refining, Inc.
Accepted _________________________
By _______________________________ By: /S/ David Cohen
 --------------------
Date _____________________________ David Cohen
 Above subject to attached condition sheets
 No. MP 6148
 SITKIN SMELTING & REFINING, INC.
 Brass, Bronze & Aluminum Ingots
 Gold, Silver & Nobel Metals
 P.O. Box 708 - R.D. #3
 Lewistown, Pa. 17044
 Phone: (717) 543-5631
EASTMAN KODAK COMPANY Page 2 of 2
 Date January 19, 1978
SITKIN SMELTING & REFINING, INC. AGREES TO PURCHASE FROM THE ABOVE
-------------------------------------------------------------------------------
QUANTITY MATERIAL
-------------------------------------------------------------------------------
REMARKS: Responsibility for the material will be transferred to Sitkin
 upon leaving Kodak Park. Ownership or claim to the material
 ceases upon destruction or change of identity.
 Sitkin will furnish a destruction warranty for each shipment
 at the time of settlement. Sitkin will furnish a secrecy
 agreement if deemed necessary by Kodak.
 This trial contract may be terminated by either party by
 written notification within two (2) days of cancellation. All
 materials delivered to the date of cancellation will, at Kodak
 [sic ] option, either be returned to Kodak freight collect or
 be processed under the contract terms.
F.O.B.
Terms
Remarks
 (1) HYDRAULICALLY BRICKED OR (2) ANY MATERIAL (3) VARIATION OF
 BRIQUETTED MATERIAL NOT OVER 15 INCHES IN PLUS OR MINUS 5%
 ACCEPTABLE. MORE THAN TWO FROM THE
 DIMENSIONS WILL BE AGREED-UPON AMOUNT
 SUBJECT TO A IS ALLOWABLE_____
 PREPARATION CHARGE.
-------------------------------------------------------------------------------
KINDLY SIGN THE ORIGINAL COPY AND RETURN IT TO US FOR OUR FILES, RETAINING THE
 OTHER COPY FOR YOUR FILES.
 Sitkin Smelting & Refining, Inc.
Accepted Eastman Kodak Company - Kodak Park Division
 ----------------------------------------------------------------
 W.H. Gabruk -
By /S/ W.H. Gabruk Director of Purchasing
 ------------------------------------------
Date January 25, 1978 By: /S/ David Cohen
 ------------------------------------------ --------------------
 David Cohen
 
 
 34
 Above subject to attached condition sheetsFrom its reading of the contract above and consideration of the circumstances surrounding this transaction, the majority concludes that, although it is a "close question," Sitkin's possession of the unprocessed film waste was a bailment under Alabama law. In so holding, the majority relies primarily on NYTCO Services, Inc. v. Wilson, 351 So.2d 875 (Ala.1977), and In re Medomak Canning Co., 25 U.C.C.Rep.Serv. 437 (D.Me.1978). I have reviewed the Kodak-Sitkin contract in light of those two cases. Unlike the majority, however, my conclusion is that NYTCO and Medomak require a holding here that the film waste was not being held by Sitkin as a bailee.
 
 
 35
 In NYTCO Services, Inc. v. Wilson, the Supreme Court of Alabama considered the bailment or sale question in the context of soybeans that were being stored in a grain warehouse. NYTCO Services was a New York warehousing firm that was engaged in the business of storing farmers' agricultural products in storage bins. As part of its business, NYTCO leased the Covington Grain storage facilities in Andalusia, Alabama. During the 1974 harvest season, local farmers had delivered soybeans to the Covington grain storage facility under a type of agreement which provided "for a price to be agreed upon later." 351 So.2d at 877. Under the agreement the farmer,
 
 
 36
 after delivering his soybeans to Covington Grain, could purchase an equivalent quantity of soybeans with a five cents per bushel handling charge plus a one and a half cent per bushel per month storage charge. The receipts most farmers received for their deliveries were various Covington Grain weight tickets; however, some received Covington Grain statement sheets. The weight tickets had the words "Bought of" printed on them together with the name of the farmer and some had the word "Hold" written on them. A number of the statement sheets had the words "Store," "Stored," or "On Storage" written on them together with the name of the farmer.
 
 
 37
 Id.
 
 
 38
 The majority reasons that in NYTCO the Supreme Court of Alabama found a bailment instead of a sale for two principal reasons: (1) the farmers had the option to require the grain storage company to either return the grain or sell it; and, (2) the evidence indicated that the soybeans were being stored by the company on the farmers' behalf.
 
 
 39
 Unlike the majority, I do not find either element present in the Kodak-Sitkin transaction. My brothers suggest that Kodak had "the option under the contract to have the film waste returned or processed." Ante, at 1217. However, as the contract itself reveals, Kodak only had such an "option" if the contract were terminated by either Kodak or Sitkin. Any right Kodak may have had to cancel the contract was extinguished when the waste was processed. The majority suggests this "makes no difference" because "(a) bailment may still exist where the bailee has a continuing option to purchase or to sell." Id. at 1217. However, under the terms of the contract, Sitkin as the purported bailee was given no "continuing option to purchase or to sell." Sitkin was required by the contract to purchase the film waste, process it, and pay Kodak. Sitkin certainly had no option to decide whether to process the waste and it was not given the liberty to sell the waste without processing it first.
 
 
 40
 Examining the second factor in NYTCO the majority concludes that several aspects of the Kodak-Sitkin arrangement evidenced a bailment instead of a sale. First the majority finds support for a bailment in Sitkin's agreement to assume responsibility for the waste by picking it up at Kodak's facility in New York and transporting it to warehouses in Alabama that Sitkin had leased. I fail to see how this aspect of the transaction indicates a bailment. The film waste apparently had little if any value to Kodak due to its inferior quality. Sitkin approached Kodak and offered to turn what was to Kodak a virtually worthless commodity into a saleable commodity from which both parties could benefit financially. Sitkin was in the business of purchasing industrial waste, transporting the waste to its own processing facilities and salvaging valuable metals from what was unusable, unmarketable junk to the sellers. Sitkin's acceptance of the goods in New York is just as consistent with a sales transaction as it may be with a bailment.
 
 
 41
 The majority also notes that the film waste had Kodak's name on it, was tagged as Kodak property, and was stored in Sitkin's warehouses in the original Kodak shipping cartons. To me these facts do not support a finding of bailment. Certainly it was more practical for Sitkin to transport and store the inferior film in its original packaging and shipping cartons. There would be no reason for Sitkin to assume the added expense and trouble of removing the film from its cartons and crossing out Kodak's brand name before the company began the salvaging process.
 
 
 42
 Furthermore, the company's accounting treatment for this transaction is totally consistent with a future sale of the film waste. For the reasons that the film waste was of no value to either party in its unprocessed state and that the sales price could only be determined by the pricing formula once the waste was processed, Kodak probably could not legally carry the waste on its books as a receivable.
 
 
 43
 In re Medomak Canning Co., supra, is considered by the majority to be "an analogous case finding a bailment." Ante, at 1217. In the Medomak case, a large food concern, William Underwood Co., did not want to produce baked beans itself. Underwood wanted to acquire finished pork and beans products from other sources. The food company entered an agreement with Medomak under which Medomak essentially would process and package the pork and beans. Underwood would purchase the food ingredients and the packaging and shipping supplies and then have them delivered to Medomak. Medomak would process the food, can it, and then ship the furnished product to locations designated by Underwood. In the court's words, it considered itself presented with "an entrusting of possession of goods to be transformed by processing or manufacture for return to the entruster or its consignees." 25 U.C.C.Rep.Serv. at 445 (emphasis added). The court concluded that "the parties contemplated merely that Medomak would process the goods entrusted to it by Underwood for later sale by Underwood to its own customers." Id. at 448 (emphasis in original).
 
 
 44
 The holding of the court in In re Medomak Canning that the processing transaction was a bailment is perfectly reasonable. The parties there clearly intended that Medomak simply receive the goods which were bought and owned by Underwood, process them, and return them to Underwood. But those circumstances which support a finding of bailment are just not present in this case. Neither Kodak nor Sitkin intended that Sitkin process the film waste and return either it or the silver content to Kodak. The only item Kodak wanted to receive from Sitkin was cash. The intent of the transaction was that the goods would be destroyed by Sitkin. There was no resale of the film waste envisioned by either Sitkin or Kodak.
 
 
 45
 Noting the Medomak court's emphasis on the fact that the parties there intended a bailment because "no purchase price was ever agreed upon in respect to those ingredients and other materials which were never processed," 25 U.C.C.Rep.Serv. at 447 (emphasis in original), the majority suggests that the Kodak-Sitkin contract reproduced above "did not set a purchase price for the film waste prior to its processing." Ante, at 1217. While Kodak and Sitkin did not specify an exact dollar amount at the time of contracting, the parties did agree to a reasonable and enforceable price calculating formula based on two factors: (1) the quantity of silver recovered from the film waste; and, (2) the market value of sliver during the thirty day settlement period. There is no requirement in Article 2 of the Code that a certain dollar price be stated in the contract in order for there to be a sale. Clearly, this is not a contract in which the parties failed to agree on a price for their goods. Such an "open price" situation would be governed by Ala.Code §§ 7-2-204 and 7-2-305. Kodak and Sitkin clearly agreed to a specific price setting formula. Thus, I consider the majority's reliance on the decision in Medomak to be misplaced.
 
 
 46
 Therefore, I conclude that the transaction at issue amounted to a contract for sale of the film waste. I acknowledge that in the contract Kodak sought to reserve title to the goods by providing that "(o)wnership or claim to the material ceases upon destruction or change of identity." In my view this provision evidenced the parties' intent to engage in a future sale of the goods. Kodak argues that the parties really intended two transactions from their one contract. First, Kodak contends that they agreed to a bailment. Second, according to Kodak, they also agreed to a future sale of future goods. Kodak convinced the majority that the goods being sold here were the silver ash "which had not yet come into existence" at the time of contracting. (Appellant's reply brief at 12.) This is belied by the contract. As noted at the outset, the goods being sold here were the 500,000 pounds of film waste. Ala.Code § 7-2-105 specifies that "(g)oods which are not both existing and identified are 'future' goods." Obviously, the film waste was "existing" at the time of contracting and clearly, as the film waste already had been delivered to Sitkin, the goods had been identified to the contract within the meaning of UCC § 2-501, Ala.Code § 7-2-501. Whether we choose to consider the contract for sale to be a present sale or a future sale is not important, however. Under Article 2 of the Code, both types of sales are permissible and are treated similarly.
 
 
 47
 Ala.Code § 7-2-106 provides in pertinent part:
 
 
 48
 "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (section 7-2-401).
 
 
 49
 Furthermore, as Official Comment 1 to § 2-106 explains, "the rights of the parties do not vary according to whether the transaction is a present sale or a contract to sell unless the Article expressly so provides." Under Ala.Code § 7-2-103(1)(d), a seller is defined as "a person who sells or contracts to sell goods." Kodak's role in this transaction falls within this definition.
 
 
 50
 Thus, Eastman Kodak as a seller of the goods sought to reserve title to the goods until such time as they underwent the silver salvaging process. UCC § 2-401 speaks directly to an effort by a seller to reserve title to goods:
 
 
 51
 (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 7-2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.
 
 
 52
 Ala.Code § 7-2-401(1) (emphasis added). Therefore, under the logically related provisions of the Code, Kodak as a seller had only a security interest in the goods which it admittedly failed to perfect.
 
 
 53
 Because the majority has decided to view this contract as a bailment-sale hybrid transaction, my brothers chose to apply Ala.Code § 7-2-403(2) to this case. However, since I consider this transaction to be an Article 2 contract for sale, I submit that instead we should apply subsection (1) of § 2-403 to this case. Ala.Code § 7-2-403 provides in pertinent part:
 
 
 54
 (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
 
 
 55
 (a) The transferor was deceived as to the identity of the purchaser, or
 
 
 56
 (b) The delivery was in exchange for a check which is later dishonored, or
 
 
 57
 (c) It was agreed that the transaction was to be a "cash sale," or
 
 
 58
 (d) The delivery was procured through fraud punishable as larcenous under the criminal law.
 
 
 59
 (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
 
 
 60
 (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.
 
 
 61
 It is undisputed that at all times during the Kodak-Sitkin transaction C.I.T. had a perfected security interest in all of Sitkin's inventory, including after-acquired inventory. As the majority acknowledges, this court, sitting en banc, held in In re Samuels & Co., 526 F.2d 1238 (5th Cir. 1976), that a secured creditor such as C.I.T. may be a good faith purchaser within the meaning of § 2-403(1), and thus its perfected security interest would be superior to the unperfected security interest of the original seller of the goods. The majority here states that § 2-403(1) applies only "where the bankrupt was a purchaser of the goods in question." Ante, at 1215. Because I consider Sitkin a "purchaser" of the film waste from Kodak, I would hold that under Samuels, C.I.T. is a good faith purchaser within the meaning of § 2-403(1) and its perfected security interest would give it title to the film waste as against Kodak, the unperfected seller of the goods to the bankrupt Sitkin.
 
 
 62
 For these reasons, I would affirm the district court's judgment for the C.I.T. Corporation.
 
 
 
 [1]
 Section 2-403 of the Alabama Code provides in pertinent part as follows:
 (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
 (a) The transferor was deceived as to the identity of the purchaser, or
 (b) The delivery was in exchange for a check which is later dishonored, or
 (c) It was agreed that the transaction was to be a "cash sale," or
 (d) The delivery was procured through fraud punishable as larcenous under the criminal law.
 (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
 (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence ....
 
 
 [2]
 Section 1-201(9) provides in full as follows:
 "Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.
 (Emphasis added). In light of our holding that C.I.T., as a secured creditor, is not a buyer in ordinary course, we do not reach the question of whether Sitkin may be considered "a person in the business of selling goods of that kind."
 
 
 [3]
 Section 2-326 provides in pertinent part:
 (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:
 (a) A "sale on approval" if the goods are delivered primarily for use, and
 (b) A "sale or return" if the goods are delivered primarily for resale.
 (2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.
 (3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this subsection is not applicable if the person making delivery:
 (a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or
 (b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or
 (c) Complies with the filing provisions of the article on secured transactions (article 9).