RONEY, Circuit Judge:
This case raises a single issue: whether the Bankruptcy Court erred in determining that possession of film entrusted to a now bankrupt metal refiner should be given to a secured creditor of the refiner rather than to the film manufacturer that entrusted it to the refiner. Holding that the bankrupt did not gain sufficient rights under the contract with the manufacturer to give its creditor a security interest in the film, we reverse.
The background of the transaction between plaintiff and the bankrupt company, as well as the terms of the contract, are somewhat unique. Prior to its bankruptcy, Sitkin Smelting and Refining Company was in the business of processing industrial waste for the recovery of precious and base metals. On January 19, 1978, Sitkin entered into an agreement with plaintiff, Eastman Kodak Company, in which it agreed to process a minimum of 500,000 pounds of print film waste and purchase the silver content recovered upon processing. This film waste consisted of film manufactured by Kodak which had been rejected as inferior by its quality control department. Its silver content is recovered by a controlled burning process which leaves an ash containing the metal.
The contract provided that it would run on a trial basis for at least two months. The waste would be picked up by Sitkin at Kodak Park in Rochester, New York, in lots of 36,000 pounds each. Responsibility for the waste transferred to Sitkin upon leaving Kodak Park.
Kodak would not sell outright the unprocessed film waste for two reasons: first, since the film was inferior, Kodak was concerned that it not find its way into the possession of persons who would use it as film; and second, collateral litigation made it important that the film not fall into the hands of Polaroid, for whom Sitkin had also been disposing of film waste. Therefore, under the contract, Kodak’s ownership of the film waste would cease only upon its “destruction or change of identity.” Either party had the right to cancel the contract with two days’ notice. Upon cancellation, the film waste in Sitkin’s possession would, at Kodak’s option, be returned to Kodak or processed. In no event could Sitkin do anything with the film but destroy it.
The contract called for a “settlement,” which was a determination of the amount owed by Sitkin after it processed each lot. A settlement would be calculated by multiplying the troy ounces of silver recovered in a lot by a percentage of a published price quote for silver. A settlement would take place thirty days after receipt of each lot, with payment due sixty days after receipt.
On March 13,1978, within the two-month period of the contract, Sitkin filed for protection under Chapter 11 of the Bankruptcy Act, and was adjudicated bankrupt shortly thereafter. At that time, Sitkin had in its possession over 382,000 pounds of Kodak film waste.
On August 30, 1978, Kodak filed suit to reclaim the unprocessed film waste, which is stored in the original Kodak cartons in two Alabama warehouses. The defendants are the Trustee in Bankruptcy and the C.I.T. Corporation, a secured creditor of Sit-kin. Although an additional quantity of film had already been processed and Kodak has not been paid for the recovered silver, it does not seek payment for the silver in this action.
In this contest between Kodak, a purported bailor, and C.I.T., who claims a security interest, Alabama law controls. See, e. g., Fowler v. Pennsylvania Tire Co., 326 F.2d 526, 530 31 (5th Cir. 1964); Universal Medical Services, Inc. v. Kutcher, 460 F.2d 524, 526 (3d Cir. 1972).
*1215 Kodak’s claim is based on the general rule that a bailor may reclaim property it entrusts to a bailee who subsequently files for bankruptcy. See, e. g., Sandack v. Tamme, 182 F.2d 759 (10th Cir. 1950). See generally 4A Collier on Bankruptcy ¶ 70.-18[4] (1978). C.I.T., as a secured creditor, claims all property in the possession of Sit-kin to which its security interest “attaches.” Under Alabama law, a security interest attaches to property in which the bankrupt has “rights,” provided that the property falls within the security agreement and the secured creditor has given value. Ala.Code tit. 7, § 9-204 (1975). C.I.T. contends that its security interest attaches to the film waste and that Kodak has only an unper-fected security interest in the property.
In resolving the conflicting claims, the Bankruptcy Court found that the agreement between Kodak and Sitkin contemplated both a bailment and a sale: Sitkin held the unprocessed waste as bailee for Kodak; a sale arose only after Sitkin processed the waste and became obligated to purchase the recovered silver content. The court went on to hold, however, that Sit-kin’s possession of the unprocessed waste, even though only a bailment, was a sufficient “right” in the waste under Alabama law so that C.I.T.’s security interest attached and was superior to Kodak’s interest. Ala.Code tit. 7, § 2 403 (1975). In so holding, the court relied on this Court’s decision in In re Samuels & Co., 526 F.2d 1238 (5th Cir. 1976) (en banc).
Section 2-403, identical to its counterpart in the Uniform Commercial Code, permits transferors of property to pass greater title in certain circumstances than they can themselves claim.[1] Section 2-403(1) provides that a buyer of goods who holds only voidable title has the power to transfer good title to a “good faith purchaser.” The purpose of this rule is to “promote the greatest range of freedom possible to commercial vendors and purchasers.” In re Samuels & Co., 526 F.2d at 1242.
In Samuels, this Court held that a secured creditor may be a “good faith purchaser” within the meaning of section 2-403(1), and may thus take good title to property to which its security interest attaches. Concluding that a creditor’s security interest in inventory attached to goods in the possession of a bankrupt, we denied the petition to reclaim by the unpaid sellers of those goods.
Samuels, however, involved a bankrupt who was a purchaser from the claimant. In the present case, the Bankruptcy Court erroneously extended Samuels to bailments. The section involved in Samuels was 2-403(1), which applies where the bankrupt was a purchaser of the goods in question. With a security interest that gave it the position of a “good faith purchaser” from a bankrupt who was itself a purchaser, C.I.T. would take title as against a seller to the bankrupt.
Section 2 403(2), however, is the provision which applies where the bankrupt holds the goods as a bailee, instead of as a purchaser. That section provides that a merchant who is entrusted with goods has power to transfer good title only to a “buy *1216 er in ordinary course of business.” Although C.I.T. may be a good faith purchaser, it is specifically excluded from being a buyer in ordinary course of business under Alabama law. Ala.Code tit. 7, § 1-201(9) (1975). Section 1-201(9), which defines a buyer in ordinary course, states that “buying” does not encompass a transfer “as security for ... a money debt.”[2] This language has been consistently interpreted to exclude holders of security interests from the coverage of section 2 403(2). See, e. g., In re Medomak Canning Co., 25 U.C.C.Rep.Serv. 437 (D.Me. April 21, 1978; aff’d 1st Cir. November 21, 1978); Cosgriff v. Liberty National Bank & Trust Co., 58 Misc.2d 884, 296 N.Y.S.2d 517 (1968). See generally Annot., 87 A.L.R.3d 11, 34 36 (1978).
The less inclusive “buyer in ordinary course” term was used for bailments because the “older loose concept of good faith and wide definition of value combined to create apparent good faith purchasers in many situations in which the result outraged common sense.” Official Comment to § 2-403, Ala.Code tit. 7, § 2 403 (1975). By restricting the category of protected buyers, section 2-403(2) serves to provide greater protection for a bailor of goods than for a seller. See R. Duesenberg & L. King, 3A Sales and Bulk Transfers under the U.C.C. § 10.06[2] (1980). These commentators state:
It should be noted that the test of Subsection (2) is not that of good-faith purchase, but a purchase in the ordinary course. This is an important distinction. . .. [T]he categories of sheltered parties under Subsection (1) of Section 2-403 is considerably more expansive than under the entrustment subsections, for “buyer in the ordinary course of business,” while it does include a secured or unsecured transaction, does not include a taking “as security for or in total or partial satisfaction of a money debt.” Comparing the two criteria, it follows, for example, that an owner defrauded by a buyer giving a bad check would lose against a creditor of the buyer who took a security interest in the goods; but would not lose against such a creditor if in place of a fraudulent purchase, the owner had entrusted the goods to a merchant who without authority pledged them as security for a debt.
Id. (footnotes omitted).
In light of its finding of a bailment of the unprocessed film waste, the Bankruptcy Court erred in applying section 2-403(1) rather than 2 403(2). Because C.I.T. is not a buyer in ordinary course within the meaning of the latter provision, it cannot divest Kodak of title in the film waste.
C.I.T. disputes on appeal the Bankruptcy Court’s finding that Sitkin’s possession of the unprocessed film waste was a bailment. It contends that the agreement between Kodak and Sitkin was under Alabama law a contract for sale of goods at a future time. While the question is a close one, we conclude that the Bankruptcy Court did not err in finding a bailment.
NYTCO Services, Inc. v. Wilson, 351 So.2d 875 (Ala.1977), is the controlling Alabama case. There, the Supreme Court of Alabama in finding a bailment rather than a sale between farmers and a grain company, cited two principal factors: the option of the farmers to require the return of their grain or to direct its sale, and evidence indicating the grain was being stored on the farmers’ behalf. 351 So.2d at 879.
*1217 Both factors are present here. First, Kodak clearly retained the option under the contract to have the film waste returned or processed. Processing, of course, would result in the sale of the silver content to Sitkin. That Sitkin also had the right to bring about a sale by processing the waste makes no difference. A bailment may still exist where the bailee has a continuing option to purchase or to sell. See, e. g., Royal Indemnity Co. v. Aetna Insurance Co., 231 F.Supp. 657, 661 (D.Md.), aff’d, 338 F.2d 700 (4th Cir. 1964); In re H.M. Hodges & Co., 38 F.Supp. 597, 597 (D.Conn.1941).
Second, as the Bankruptcy Court noted, several aspects of the arrangement indicated a bailment. Responsibility for the waste transferred to Sitkin upon leaving Kodak Park, which is consistent with a bailee’s duty of care. The film was clearly imprinted with Kodak’s name, tagged identifying it as Kodak property, stored in the original Kodak cartons, and kept in separate warehouses apart from similar material to be processed. Finally, in their bookkeeping, Kodak did not show the waste as a receivable; Sitkin did not carry it as inventory.
The First Circuit case of In re Medomak Canning Co., 25 U.C.C.Rep.Serv. 437, is an analogous case finding a bailment. In that case a large food retailer agreed to supply Medomak with certain ingredients for processing, and to then purchase the finished product. When Medomak filed for bankruptcy, the retailer sought possession of the ingredients. As here, the case turned upon whether the transaction between the two companies was a bailment or a sale.
In finding that Medomak held the ingredients as a bailment, the Bankruptcy Court looked into the intentions and circumstances of the parties rather than to a provision in the contract designating the transaction a “purchase” by Medomak. In particular, the court found that no purchase price was agreed upon as to the ingredients prior to processing. A price was instead fixed only for the finished product. In addition, the court held that the parties did not intend for the retailer to part with any interest in the ingredients furnished to Medomak until they were processed.
As in Medomak, the agreement between Kodak and Sitkin did not set a purchase price for the film waste prior to its processing. Although the contract estimated the silver content of the waste, the exact amount of silver as well as the purchase price became certain only after the waste had been processed. Moreover, as the Bankruptcy Court held, Kodak and Sitkin clearly showed an intention to avoid any rights in Sitkin until the destruction of the film waste.
C.I.T.’s final argument, rejected by the Bankruptcy Court, is that the waste was delivered to Sitkin on a “sale or return” basis. Ala.Code tit. 7, § 2-326 (1975). Under section 2 326, goods in the possession of a buyer which were delivered on a sale or return basis are subject to the claims of the buyer’s creditors.[3]
*1218 The type of sale or return contemplated in section 2-326 is a consignment, where a buyer “purchases” goods with the understanding that the seller will accept their return in lieu of payment if they fail to be resold. The Official Comment to section 2-326 states that this type of transaction is “so strongly delineated in practice and in general understanding that every presumption runs against a delivery to a consumer being a ‘sale or return.’ ” Official Comment to § 2-326, Ala.Code tit. 7, § 2 -326 (1975).
The transaction between Kodak and Sit-kin is not a sale or return within the meaning of section 2-326, since the goods were not delivered for resale with an option to return. C.I.T., then, fails to overcome the presumption against the application of section 2-326.
The Bankruptcy Court properly concluded that the agreement between Kodak and Sitkin provided for a bailment of the unprocessed waste. Since under Alabama law the bailed goods are not subject to C.I.T.’s security interest in the inventory of the bankrupt, Kodak is entitled to reclaim possession.
REVERSED.

. Section 2-403 of the Alabama Code provides in pertinent part as follows:
(1)A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
(a) The transferor was deceived as to the identity of the purchaser, or
(b) The delivery was in exchange for a check which is later dishonored, or
(c) It was agreed that the transaction was to be a “cash sale,” or
(d) The delivery was procured through fraud punishable as larcenous under the criminal law.
(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.
(3) “Entrusting” includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence ....

. Section 1-201(9) provides in full as follows:
“Buyer in ordinary course of business” means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. “Buying” may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.
(Emphasis added). In light of our holding that C.I.T., as a secured creditor, is not a buyer in ordinary course, we do not reach the question of whether Sitkin may be considered “a person in the business of selling goods of that kind.”

. Section 2-326 provides in pertinent part:
(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:
(a) A “sale on approval” if the goods are delivered primarily for use, and
(b) A “sale or return” if the goods are delivered primarily for resale.
(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer’s creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer’s possession.
(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as “on consignment” or “on memorandum.” However, this subsection is not applicable if the person making delivery:
(a) Complies with an applicable law providing for a consignor’s interest or the like to be evidenced by a sign, or
*1218 (b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or
(c) Complies with the filing provisions of the article on secured transactions (article 9).