USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1136 EVERGREEN MARINE CORPORATION, Plaintiff, Appellant, v. SIX CONSIGNMENTS OF FROZEN SCALLOPS, IN REM, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Torruella, Selya and Cyr, Circuit Judges. ______________ ____________________ Joseph F. De May, Jr. with whom Cichanowicz, Callan & Keane, _______________________ ____________________________ Thomas J. Muzyka, and Clinton & Muzyka, P.C. were on brief for _________________ ________________________ appellant. Evan Slavitt with whom Hugh J. Gorman III and Hinckley, Allen & ____________ ___________________ __________________ Snyder were on brief for appellees. ______ ____________________ September 17, 1993 ____________________ CYR, Circuit Judge. Appellant Evergreen Marine Cor- CYR, Circuit Judge. _______ _____ poration, an ocean carrier, was fraudulently induced to discharge six consignments of frozen scallops, valued at $1.2 million, to Gloucester Corporation, without taking up possession of the bills of lading. After Gloucester became insolvent, the discharged scallops were seized by appellees Fleet National Bank and Cooper- ative Centrale Raiffeisen-Boerenleenbank B.A. (hereinafter, collectively, "the Banks"), holders of security interests in Gloucester's after-acquired inventory. The district court entered summary judgment for the Banks on Evergreen's claim for conversion. As we conclude on the present record that Evergreen held a superior claim to the scallops, we vacate the judgment and remand for further proceedings. I I FACTS FACTS _____ On various dates in 1991, Evergreen contracted with Towamarin, Ltd. to carry six consignments of frozen scallops from Tokyo, Japan to Port Elizabeth, New Jersey. Evergreen thereupon issued order bills of lading, designating Gloucester as "Notify Party."1 When the scallops arrived at Port Elizabeth, Glouces- ____________________ 1An order bill of lading is a negotiable instrument, issued by the carrier to the shipper at the time goods are loaded aboard ship, which serves "as a receipt that the carrier has received [the] goods for shipment; as a contract of carriage for those goods; and as documentary evidence of title to those goods." ter represented that it held title to the scallops but that the bills of lading were still in transit. For present purposes, the circumstantial evidence, infra, compels the inference that _____ Gloucester's representations of title were false and fraudulent at the time made. See Continental Grain Co. v. Puerto Rico ___ ______________________ ____________ Maritime Shipping Auth., 972 F.2d 426, 429-30 (1st Cir. 1992) ________________________ (under Rule 56(c), all reasonable inferences must be drawn in favor of party opposing summary judgment). Evergreen released the scallops to Gloucester, without taking up the original bills of lading, upon Gloucester's execu- tion of certain indemnity and guarantee agreements ("letters of guaranty"). The letters of guaranty included Gloucester's representations of title to the scallops under the bills of lading; its promise to produce the bills of lading "as soon as [the bills] shall have arrived and/or come into [Gloucester's] possession;" and its agreement to defend and indemnify Evergreen ____________________ Fuentes v. Sea-Land Services, 665 F.Supp. 206, 209 (S.D.N.Y. _______ __________________ 1987). The shipper sends the bill of lading to the intended recipient of the goods (consignee); upon notification that the goods have arrived, the consignee presents the bill to the carrier at the delivery port, and receives the goods in return. Because an order bill is negotiable, however, the consignee or "notify party" designated on the bill of lading is not necessari- ly the holder of the bill at the time and place of delivery. Under these circumstances, subject to extremely limited excep- tions, a carrier which delivers to a "notify party," or to any other person, without taking up and canceling its order bill "remains liable to anyone who has purchased the bill for value in good faith, before or after the improper delivery." G. Gilmore & C. Black, Admiralty 110-12 (2d ed. 1975). See also Allied _________ ___ ____ ______ Chemical Intl. Corp. v. Companhia de Navegacao Lloyd Brasileiro, ____________________ _______________________________________ 775 F.2d 476, 481-82 (2d Cir. 1985) (discussing obligations of carrier in maritime documentary transaction), cert. denied, 475 _____ ______ U.S. 1099 (1986). 3 against third party claims.2 Shortly after issuing the letters of guaranty and removing the scallops to its Massachusetts ware- house, Gloucester became insolvent; the scallops were seized by the Banks pursuant to their security interests in Gloucester's after-acquired inventory. On February 7, 1992, a third party, Raiffeisenbank Lekkerkerk Holland ("Dutch Bank"), notified Evergreen that it ____________________ 2The executed letters of guaranty provided: The above goods were shipped on [the listed vessel] by . . . TOWAMARIN, LTD. . . . (and consigned to us) but the relevant Bill(s) of Lading have not arrived. We hereby request you to deliver such goods to THE GLOU- CESTER CORPORATION (us) without production of the Bill(s) of Lading. In consideration of your complying with our above request we hereby agree as follows: 1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability loss or damage of whatsoever nature which you may sustain by reason of delivering the goods to US . . . in accordance with our request. 2. In the event of any proceedings being commenced against you or any of your servants or agents in con- nection with the delivery of the goods as aforesaid to provide you or them from time to time with sufficient funds to defend the same. * * * * 4. As soon as all original Bill(s) of Lading for the above goods shall have arrived and/or come late into our possession, to produce and deliver the same to you whereupon our liability hereunder shall cease. * * * * /s/ THE GLOUCESTER CORPORATION 4 held the true bills of lading for the six consignments of scal- lops.3 Facing liability to Dutch Bank, Evergreen sued the Banks, Gloucester, and the scallops, seeking recovery of the scallops or tort damages for their value.4 See Evergreen Marine ___ ________________ Corp. v. Six Consignments of Frozen Scallops, 806 F. Supp. 291 _____ ____________________________________ (D. Mass. 1992). The district court denied admiralty jurisdic- tion and dismissed Evergreen's Rule D claim against the scallops in rem. Upon affirming its diversity jurisdiction, however, the __ ___ court applied Massachusetts law to Evergreen's remaining claims. Id. at 293-94. The court dismissed Evergreen's claim against the ___ Banks for tortious interference with contract, see id. at 296, ___ ___ and entered summary judgment for the Banks on Evergreen's conver- sion and replevin claims, on the ground that the Banks' perfected security interest in Gloucester's inventory was superior to Evergreen's reclamation rights. See id. at 297. As Evergreen's ___ ___ brief on appeal is expressly limited to its conversion claim, its other claims are deemed waived. See Washington Legal Found. v. ___ ________________________ Massachusetts Bar Found., 993 F.2d 962, 970 n.4 (1st Cir. 1993) ________________________ ____________________ 3Lekkerkerk is identified as "Lekkekerk" in the Banks' brief, and as "Lekkerrerk" in Gloucester's complaint and the district court opinion. See 806 F. Supp. at 293. The Banks ___ assert, without contradiction, that "although [Lekkerkerk] has a somewhat similar name, [it] is an entirely different bank" from defendant-appellee Cooperative Centrale Raiffeisen-Boerenleen Bank. 4Evergreen's amended complaint included counts (1) against Gloucester, for misrepresentation and breach of contract; (2) against the scallops, in rem, under Supplemental Admiralty __ ___ Rule D; and (3) against the Banks, for conversion and replevin. A default judgment was entered against Gloucester on December 10, 1992, for failure to defend the action. 5 (claims not raised on appeal are deemed abandoned); Sheinkopf v. _________ Stone, 927 F.2d 1259, 1263 (1st Cir. 1991) (similar). _____ II II GOVERNING LAW GOVERNING LAW _____________ As an initial matter, Evergreen asserts that its conversion claim was subject to the district court's admiralty jurisdiction. Although the Banks do not challenge diversity jurisdiction, see 806 F. Supp. at 295, they contest admiralty ___ jurisdiction, apparently to avoid the application of maritime law. See, e.g., Austin v. Unarco Inds., Inc., 705 F.2d 1, 6 n.1 ___ ____ ______ __________________ (1st Cir.), cert. dismissed, 463 U.S. 1247 (1983) ("once admiral- _____ _________ ty jurisdiction is established, then all of the substantive rules and precepts peculiar to the law of the sea become applicable") (quoting Brance v. Shumann, 445 F.2d 175, 178 (5th Cir. 1971)). ______ _______ The parties have identified no material difference between maritime law and Massachusetts law governing these conversion claims. Compare Goodpasture, Inc. v. M/V Pollux, 602 F.2d 84, 87 _______ _________________ __________ (5th Cir. 1979), cert. denied, 460 U.S. 1084 (1983) (identifying _____ ______ elements of conversion claim in admiralty), with, e.g., Joseph R. ____ ____ Nolan & Laurie J. Santorio, 37 Massachusetts Practice: Tort Law, _________________________________ 55 (2d ed. 1989), at 65 (identifying elements of conversion claim under Massachusetts law). Assuming differences exist, however, see Furness Withy (Chartering), Inc. v. World Energy ___ __________________________________ ____________ Sys. Assoc., 854 F.2d 410, 412 (11th Cir. 1988), cert. denied, ____________ _____ ______ 6 489 U.S. 1013 (1989), we agree with the district court that Massachusetts law governs Evergreen's claim. The admiralty jurisdiction test for tort claims is "clearly established." Shea v. Rev-Lyn Contracting Co., 868 F.2d ____ _______________________ 515, 517 (1st Cir. 1989). It comprises two functional inquiries: first, the traditional "situs" analysis determines whether the tort was committed or the alleged injury occurred on navigable waters, see id. (citing The Plymouth, 70 U.S. (3 Wall.) 20, 33 ___ ___ ____________ (1866)); and, second, the more recently developed "nexus" analy- sis determines whether the alleged tort bears a significant relationship to traditional maritime activities. See Foremost ___ ________ Ins. Co. v. Richardson, 457 U.S. 668 (1982); Executive Jet ________ __________ ______________ Aviation, Inc. v. Cleveland, 409 U.S. 249 (1972). The "situs" _______________ _________ and "nexus" requirements must both be met before admiralty jurisdiction can attach. See, e.g., Shea, 868 F.2d at 517 ___ ____ ____ (noting dual nature of test); Carey v. Bahama Cruise Lines, 864 _____ ____________________ F.2d 201, 207 n.4 (1st Cir. 1988) (same); accord, Cochran v. ______ _______ E.I. DuPont de Nemours & Co., 933 F.2d 1533, 1537 (11th Cir. ______________________________ 1991) ("The Court in Executive Jet did not replace the tradition- _____________ al locality test, but instead added a second prong, the nexus test"), cert. denied, 112 S.Ct. 881 (1992). _____ ______ The present conversion claim founders on the "situs" prong of the Executive Jet analysis. In the admiralty context, ______________ as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control over a chattel, which seriously ____ _ _______ interferes with the owner's rights in the chattel. See ___ 7 Goodpasture, 602 F.2d at 87; Berry v. Boat Giannina B., Inc., 460 ___________ _____ ______________________ F. Supp. 145, 150 (D. Mass. 1978); Restatement (Second) of Torts _____________________________ 222A (1965). Admiralty jurisdiction over a conversion claim accordingly depends on whether the chattel was "on navigable waters" at the time of the alleged wrongful exercise of dominion. See, e.g., Leather's Best, Inc. v. S/S Mormaclynx, 451 F.2d 800, ___ ____ ____________________ ______________ 808 (2d Cir. 1971) (no admiralty jurisdiction over warehouseman whose loss of property, entrusted by ocean carrier, occurred while goods were on land); cf. Schoening v. Shipment of 102 Jute ___ _________ _____________________ Bags, 132 F. Supp. 561, 562 (E.D. Pa. 1955) (no admiralty juris- ____ diction over ocean carrier for shipment of goods converted from onshore warehouse; "the conversion was completed when the goods were removed from the warehouse"); see generally The Lydia, 1 ___ _________ _________ F.2d 18, 23 (2d Cir.) cert. denied, 266 U.S. 616 (1924) ("conver- _____ ______ sion is a tort, . . . and if that tort is committed on navigable waters, admiralty has jurisdiction"). In the present case, long before the Banks asserted dominion over the scallops under the terms of their security agreements, Gloucester had removed the scallops to its storage warehouse in Massachusetts, some four hundred miles from the point of Evergreen's disaffreightment in Port Elizabeth, thereby severing any conceivable maritime situs. Compare Leather's Best, 451 F.2d at 808. _______ ______________ Evergreen bases its assertion of admiralty jurisdiction on the ground that the district court's decision "directly affects the integrity of order bills of lading." Thus, apparent- ly Evergreen would extend the so-called "impact" test for admi- 8 ralty jurisdiction, applicable to claims for intentional inter- ference with contractual relations, to the present claim for conversion. See Carroll v. Protection Maritime Ins. Co., 512 ___ _______ _____________________________ F.2d 4, 8 (1st Cir. 1975) (articulating "impact" test); see also ___ ____ Pino v. Protection Maritime Ins. Co., 599 F.2d 10, 12-13 (1st ____ ______________________________ Cir.) cert. denied, 444 U.S. 900 (1979) (reaffirming Carroll's _____ ______ _______ "extension of location test"). We agree with the district court that the Carroll "impact test" does not apply to the present _______ transaction. Carroll was an action for tortious interference with _______ contractual relationships, brought by various seamen and commer- cial fishermen, against marine insurers whose "blacklist" of past claimants allegedly interfered with the claimants' efforts to contract for employment on marine vessels. Although it was alleged that the blacklist prevented the claimants, while on _____ __ land, from securing contracts of employment, its purpose and ____ effect was to prevent their employment aboard seagoing vessels. __________ ______ ________ _______ 512 F.2d at 6. On these facts, the Carroll court concluded, "the _______ critical focus should not be 'where the wrongful act or omission has its inception, but where the impact of the act or omission produces [the] injury," id. at 8 (citing O'Connor & Co. v. City ___ ______________ ____ of Pascagoula, 304 F. Supp. 681, 683 (S.D. Miss. 1969)). Apply- ______________ ing this principle, Carroll held that "the impact of defendants' _______ alleged actions, at least where existing employment was terminat- ed, was felt in the operations of the affected vessels at sea," id., and was "so interwoven with present and potential maritime ___ 9 contractual relationships traditional concerns of admiralty as to fall within [the admiralty] jurisdiction," id. at 8-9. ___ Unlike the Carroll claim for interference with a _______ contract, Evergreen's conversion claim alleges interference with ________ chattels. A chattel has a determinate location; hence the ________ "situs" of the tort of conversion is more readily identified, and does not depend solely on an assessment of its impact upon mari- time activities. Furthermore, the relevant purposeful act in the tort of conversion is the exercise of dominion over a chattel, ________ __ ________ which may entail liability even though the defendant initially acted on a good-faith, non-maritime claim of right. See, e.g., ___ ____ Restatement (Second) of Torts 244 (1965) ("actor is not re- ______________________________ lieved of liability . . . for conversion by his belief, because of a mistake of law or fact not induced by the other, that he . . . is entitled to . . . immediate possession [of the converted chattel]"). In these circumstances, the "maritime nexus," found "dominant" in Carroll, see 512 F.2d at 6, is sufficiently attenu- _______ ___ ated that a Carroll-based "impact" analysis would invite "open- _______ ended expansion of admiralty jurisdiction," id. Thus, the __ district court correctly concluded that Evergreen's conversion claim implicated its diversity jurisdiction, rather than admiral- ty jurisdiction, and that to the extent differences exist the conversion claim was governed by Massachusetts law, rather than maritime law. III III 10 DISCUSSION DISCUSSION __________ A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intention- ally and wrongfully exercised control or dominion over the personal property, (2) the plaintiff had an ownership or posses- sory interest in the property at the time of the alleged conver- sion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.5 See 806 F. Supp. at 296-97 ___ (citing Magaw v. Beals, 272 Mass. 334, 172 N.E. 347 (1930)); see _____ _____ ___ also In re Halmar Distributors, Inc., 968 F.2d 121, 129 (1st Cir. ____ _______________________________ 1992); MacNeil v. Hazelton, 306 Mass. 366, 367, 28 N.E.2d 477, _______ ________ 478 (1940). Since the evidence establishes beyond dispute that the Banks asserted dominion over the scallops, and refused Evergreen's demands for their return, see 806 F. Supp. at 295-97, ___ the principal issue before us is whether any rights the Banks may have acquired by virtue of their security interests in Glou- cester's after-acquired inventory were superior to Evergreen's ____________________ 5Federal courts sitting in diversity apply the choice-of-law rules of the forum state. See Klaxon Co. v. Stentor Elec. Mfg. ___ __________ __________________ Co., 313 U.S. 487, 496 (1941). Since the parties have ignored ___ choice-of-law issues on appeal, we indulge their assumption that Massachusetts would apply its own substantive law. See Carey, ___ _____ 864 F.2d at 206 (given "reasonable relation" between dispute and forum whose law is invoked by parties, court of appeals may "forego independent analysis" of choice-of-law issue); Borden v. ______ Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) ___________________________ (similar). 11 reclamation rights as bailee of the scallops under the order bills of lading. We review summary judgments de novo, affirming only if __ ____ it appears after considering all competent evidence and reasonable inferences in the light most favorable to the non- moving party that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See, e.g., Continental Grain Co., 972 F.2d at 429-30; ___ ____ ______________________ National Expositions, Inc. v. Crowley Maritime Corp., 824 F.2d ___________________________ ______________________ 131, 134 (1st Cir. 1987). A. Evergreen's Interest A. Evergreen's Interest ____________________ The district court likened Evergreen's interest in the scallops to that of a seller of goods, and Gloucester to "an ______ insolvent buyer", see 806 F. Supp. at 297; hence the putative ___ "sale," though voidable, was not void until Evergreen disavowed ________ ____ it and moved to reclaim the goods. See Mass. Gen. L. ch. 106 ___ 2-702(2) ("seller [who] discovers that the buyer has received goods on credit while insolvent . . . may reclaim the goods upon ___ ____ demand") (emphasis added). Under this analysis, since an Article ______ 9 secured party is a "purchaser" of the debtor's interest in the collateral, see id. at 1-201(32), 1-201(33); Burk v. Emmick, ___ ___ ____ ______ 637 F.2d 1172, 1174 (8th Cir. 1980); In re Samuels & Co., 526 _____________________ F.2d 1238, 1242 (5th Cir.), cert. denied, 429 U.S. 834 (1976), _____ ______ Evergreen's failure to disavow the sale prior to the Banks' "purchase" through foreclosure subordinated Evergreen's interest to the Banks' security interests in the scallops. See Mass. Gen. ___ 12 L. ch. 106, 2-702(3) ("the seller's right to reclaim . . . is subject to the rights of . . . [a] good faith purchaser or lien creditor under this Article"); see also id. at 2-403(1) ("A ___ ____ ___ purchaser of goods acquires all title which his transferor had or had power to transfer . . . . A person with voidable title has ________ _____ power to transfer good title to a good faith purchaser for value. Where goods have been delivered under a transaction of purchase the purchaser has such a power even though . . . (d) the delivery was procured through fraud") (emphasis added). The difficulty with the district court's analysis lies in its fundamental premise, viz., that Evergreen, in releasing ____ the scallops to Gloucester pursuant to the letters of guaranty, was a "seller," and Gloucester, in thus acquiring possession, was a "buyer." Rather, we think the transaction was one of "entrust- ment," see Mass. Gen. L. ch. 106, 2-403(2),(3), whereby neither ___ Gloucester nor the Banks acquired an interest in the scallops superior to Evergreen's limited right to their possession. Under the Uniform Commercial Code, a "seller" is "a person who sells or contracts to sell goods," id at 2-103(1)- __ (d), and a "buyer" one "who buys or contracts to buy goods," id. ___ at 2-103(1)(a). A "sale," by definition, "consists in the ________ __ ___ passing of title from the seller to the buyer for a price (sec- _______ __ _____ tion 2-401)," id. at 2-106(1) (emphasis added), and a "contract ___ for sale" means "a present sale of goods or a contract to sell goods at a future time." Id. Accordingly, though U.C.C. 2-401 ___ does not define "title," noting simply that "each provision of 13 . . . Article [2] with regard to the rights, obligations and remedies of the seller, the buyer, purchasers and other third parties applies irrespective of title to the goods except where ____________ __ _____ ______ _____ the provision refers to such title,"6 id. at 2-401 (emphasis ___ _________ ______ __ ____ _____ ___ added), no "sale" of goods occurs, within the meaning of 2-106, without a present or future capacity on the part of the "seller" ________ to convey title to the "buyer." See generally William L. Tabac, _____ ___ _________ The Unbearable Lightness of Title Under the Uniform Commercial ___ __________ _________ __ _____ _____ ___ _______ __________ Code, 50 Md. L. Rev. 408 (1991) (noting contradictions in Article ____ Two references to title; concluding that "title under the Code means ownership," and that "title principles are still firmly in place, if not in sight, as the framework for today's commerce in goods"). We return to the present transaction with these prin- ciples in mind. It is well settled that an ocean carrier possesses no title or other ownership interest in goods carried under a negotiable bill of lading; title is vested in the holder of the bill of lading, whose interests the carrier represents, under the contract of carriage and maritime law, as "a special type of bailee." See Commercial Molasses Corp. v. New York Tank Barge ___ __________________________ ____________________ Corp., 314 U.S. 104, 109 (1941); Schnell v. The Vallescura, 293 _____ _______ _______________ U.S. 296, 303 (1934); C-ART, Ltd. v. Hong Kong Islands Line ___________ _______________________ America, S.A., 940 F.2d 530, 533 n.2 (9th Cir. 1991), cert. ______________ _____ denied, 112 S.Ct. 1762 (1992); see also Baker Oil Tools, Inc. v. ______ ___ ____ _____________________ Delta S.S. Lines, Inc., 562 F.2d 938 (5th Cir. 1977) (bailment _______________________ ____________________ 6See, e.g., Mass. Gen. L. ch. 106, 2-403(1),(2),(3). ___ ____ 14 relationship under contract of carriage continues before and after termination of voyage); cf. U.C.C. 2-705(1) (referring to ___ "goods in possession of a carrier or other bailee"). Thus, absent extraordinary circumstances, such as rapid deterioration of the cargo, see T.J. Stevenson & Co. v. 81,193 Bags of Flour, ___ _____________________ _____________________ 449 F. Supp. 84, 123 (S.D. Ala. 1979), aff'd. in pertinent part, ______ __ _________ ____ 629 F.2d 338, 383 (5th Cir. 1980), the carrier has neither actual nor apparent authority to "sell" the goods it carries.7 The carrier's sole legitimate interest is its limited right to pos- ____ sess the goods, pending presentment of the bills of lading; and ____ its temporary release of possession, pending a consignee's promised production of the bills of lading, is not a "sale" but an entrustment. See Mass. Gen. L. ch. 106, 2-403(3) ("'En- ___________ ___ trusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition ____________________ 7Indeed, the summary judgment record in the present case indisputably demonstrates that there can have been no "contract," within the meaning of Article 2: "In this Article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods." Mass. Gen. L. ch. 106, 2-106(1). Moreover, not only does a future sale of goods require a contract of sale, id., but a "'present ___ sale' means a sale which is accomplished by the making of the contract," id. (emphasis added). Since the express terms of the ________ ___ letters of guaranty flatly belie Evergreen's capacity to effect ________ either a present or future sale of scallops in which Gloucester already purportedly held title by virtue of its claim to the negotiable bills of lading in transit, there could be no contract or agreement of sale of any kind between Evergreen and Glouces- ter. See also id. 1-201(3),(11). ___ ____ ___ 15 of the goods have been such as to be larcenous under the criminal law.").8 On similar analysis, although "purchase" is defined more broadly than "sale," without reliance on "title" principles, see id. 1-201(32) ("'purchase' includes taking by sale, dis- ___ ___ count, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property"), under a "transaction of purchase" a "purchaser of goods acquires [only the] title which his transferor had or had __________ ___ __ ___ power to transfer . . . [and] a purchaser of a limited interest _____ acquires rights only to the extent of the interest purchased," id. 2-402(1). Thus, a person who knowingly obtains goods ___ subject to an outstanding negotiable bill of lading from an ocean carrier with a mere possessory interest in the goods, ordinarily "purchases" no "title" (even voidable title) in the goods. See generally, e.g., Kimberly & European Diamonds, Inc. ___ _________ ____ ___________________________________ v. Burbank, 684 F.2d 363, 366 (6th Cir. 1982) (bailee "had no _______ title, nor did she have authority to pass title," and putative ____________________ 8The Banks do not benefit from U.C.C. 2-403(2), which provides that "any entrusting of goods to a merchant who deals in goods of that kind gives [the merchant] power to transfer all rights of the entruster to a buyer in the ordinary course of business." It is well settled that U.C.C. 2-403(2) protects only "persons who buy in the ordinary course out of inventory." See U.C.C. 2-403(2) cmt. 3. The holder of a security interest ___ in a merchant's inventory is not "a buyer in the ordinary course" of goods entrusted to the merchant's possession as a result of the merchant's fraud. See U.C.C. 1-201(9) (defining "buyer in ___ the ordinary course of business" as excluding a "transfer . . . as security for . . . a money debt"); see also, e.g., Sitkin ___ ____ ____ ______ Smelting, 639 F.2d at 1213; Robert A. Hillman et al., Common Law ________ __ __ __________ and Equity Under the Uniform Commercial Code (1985 & Supp. 1991), ____________________________________________ at 18.03[2][b]. 16 purchaser from bailee "acquired no interest" in bailed property); In re Sitkin Smelting & Refining Inc., 639 F.2d 1213, 1215-17 _______________________________________ (5th Cir. 1981) (similar); Robert A. Hillman et al., Common Law __ ___ __________ and Equity Under the Uniform Commercial Code (1985 & Supp. 1991), ____________________________________________ at 18.03[2] (collecting cases).9 Finally, on similar reasoning, we cannot credit the Banks' reliance on the Uniform Commercial Code provisions govern- ing "consignment sales": Where goods are delivered to a person for _________ __ _ ______ ___ sale and such person maintains a place of ____ business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with ____ respect to claims of creditors of the person _______ __ ______ __ _________ __ ___ ______ conducting the business the goods are deemed __________ ___ ________ ___ _____ ___ ______ to be on sale or return. The provisions of __ __ __ ____ __ ______ this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or re- sale or uses such words as 'on consignment' or 'on memorandum.' Mass. Gen. L. ch. 106, 2-326(3) (emphasis added). Thus, even assuming that Gloucester "dealt in goods" like these (which cannot be conclusively determined from the appellate record), the scallops were not subject to the claims of Evergreen's creditors unless delivered "for sale" or "for resale," id. 2-326. As ___ both parties well recognize, Evergreen lacked both the intent and the legal capacity to empower Gloucester either to resell, see ___ id. at 2-326(1)(b), or to sell, see id. at 2-326(3), these ___ ___ ___ scallops so long as title remained exclusively in the holder of ____________________ 9Of course, restrictions on a "seller's" reclamation rights, see, e.g., Mass. Gen. L. ch. 106 2-507, 2-702(3), are in- ___ ____ applicable for the same reason. 17 the negotiable bills of lading.10 Thus, we join those courts which have held that temporary entrustments of possession by a bailee, without more, are not "sales on consignment," within the meaning of U.C.C. 2-326. See Sitkin Smelting, 639 F.2d at 1218 ___ _______________ (delivery of waste film, for processing and extraction, not a "delivery for sale" under U.C.C. 2-326); cf. e.g., In re ___ ____ _____ Zwagerman, 115 B.R. 540 (Bankr. W.D. Mich. 1990) (delivery of _________ cattle, for "feeding," not a "delivery for sale"), aff'd, 125 _____ B.R. 486 (W.D. Mich. 1991); In re Key Book Service, Inc., 103 ______________________________ B.R. 39 (Bankr. D. Conn. 1989) (delivery of books, merely for shipping, billing, warehousing, not a "delivery for sale"); see ___ generally Hillman, supra, at 18.03-[2][c] & n.126 (discussing _________ _____ meaning of "delivery for sale"). Finally, under Mass. Gen. L. ch. 106, 9-203(1)(c), "[a] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless . . . the debtor has rights in the collateral." (Emphasis ______ ___ ______ __ ___ __________ added.) Although the term "rights in the collateral" is not defined in the Code, and has been viewed broadly by courts on occasion, see, e.g., Kinetecs Technology Int'l Corp. v. Fourth ___ ____ ________________________________ ______ Nat'l Bank, 705 F.2d 396 (10th Cir. 1983) ("the Code clearly does __________ ____________________ 10The letters of guaranty are not phrased in terms of a delivery for sale or resale, but of an entrustment of possession pending Gloucester's presentment of the order bills of lading. See supra note 2. Thus, the letters of guaranty evince (1) ___ _____ Gloucester's acknowledgement that title to the scallops was in the holder of the order bills of lading, not Evergreen, and (2) Gloucester's representation that it was the holder of the bills. 18 not require that a debtor have full ownership rights"), it clearly contemplates some property interest in goods, not mere ________ ________ bare possession acquired from a bailee under a transaction of entrustment. Sitkin Smelting, 639 F.2d at 1217-18; Northwestern _______________ ____________ Bank v. First Virginia Bank, 585 F. Supp. 425, 428-29 (W.D. Va. ____ ____________________ 1984) ("Mere possession by the debtor is insufficient to estab- lish a right in the collateral upon which to base a security interest . . . . The debtor must acquire some ownership interest in the collateral before a valid security interest arises"); see ___ generally James J. White & Robert S. Summers, Uniform Commercial _________ ___________________ Code 23-5 (3d ed. 1988), at 263 ("if the transaction [endowing ____ debtor with possession] were merely a bailment . . . the law would be clear: the bailed goods would be returned to the owner"); Hillman, supra, at 18.03[1]. Since mere possession of _____ goods under a transaction of entrustment clothes a debtor with no "rights in the collateral" to which a security interest can attach, within the meaning of Mass. Gen. L. ch. 106, 9-203- (1)(c), the Banks acquired no enforceable lien in the scallops by virtue of their security interests in Gloucester's after-acquired inventory.11 II II CONCLUSION CONCLUSION __________ ____________________ 11 As Dutch Bank is not a party to these proceedings, we take no position on any potential claim it may have for Ever- green's entrustment of possession of the scallops to Gloucester without first taking up possession of the bills of lading. But ___ see supra n.1. ___ _____ 19 Evergreen was not a "seller," Gloucester was not a "buyer," and the temporary entrustment of possession of the scallops to Gloucester was neither a "sale" nor a delivery for sale or resale. Thus, as a bailee, Evergreen retained reclama- tion rights to the scallops under a common law claim for conver- sion. See Restatement (Second) of Torts, 225 & cmt. b; see ___ ______________________________ ___ also id. at 222A, illustr. 9. As the Banks' Article 9 security ____ ___ interests in Gloucester's after-acquired inventory did not attach to the entrusted scallops, Evergreen retained a possessory claim sufficient to overcome the Banks' motion for summary judgment.12 The district court judgment is vacated and the case is ___ ________ _____ ________ __ _______ ___ ___ ____ __ remanded for further proceedings consistent herewith; each party ________ ___ _______ ___________ __________ ________ ____ _____ to bear its own costs on appeal. __ ____ ___ ___ _____ __ ______ ____________________ 12Evergreen filed no cross-motion for summary judgment, however. Accordingly, the case must be remanded to the district court for such further proceedings as are consistent with this opinion. 20